**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 31 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

GARY L. BROWN; MARY A. BROWN; SIDNEY
A. REITZ, Trustees of the Harold E. Brown Trust
No. 1 (Trust B) Dated June 1, 1972,

    Plaintiffs - Appellants,

v.

SAMSON RESOURCES COMPANY,

    Defendant - Third Party Plaintiff - Appellee,

v.

J.M. HUBER CORPORATION,

    Third Party Defendant - Appellant.

Nos. 99-6344 &
99-6345
(W.D. Okla.)
(D.Ct. No. CV-98-238-M)

_____

**ORDER AND JUDGMENT**[*]

Before **BRORBY**, **ANDERSON**, and **LUCERO**, Circuit Judges.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

This is a contract interpretation case set in the oil fields of Oklahoma. More specifically, the question presented is whether the preferential right to purchase provision of the relevant joint operating agreement allows a preferential right-holder to exercise its right as to a singular oil well sold as part of a "package deal" that includes other wells subject to its rights. We answer the question in the negative and reverse.

## BACKGROUND[1]

If the contract in question is our script, it may be useful to first meet the players. The troupe of litigants includes Plaintiff Trustees of the Harold E. Brown Trust (Brown), Third-Party Defendant J.M. Huber Corporation (Huber), and Defendant/Third-Party Plaintiff Samson Resources Company (Samson). The props at center stage are two oil wells in Grady County, Oklahoma, known as Cummings No. 1 (Cummings) and Lance No. 1 (Lance). When the curtain came up on this dispute, the parties each had various leasehold interests in the respective wells: Brown owned an interest in the Cummings well, while Samson and Huber each owned an interest in both the Cummings and Lance wells.

---

[1] The parties agree this case presents no disputed issues of material fact. Therefore, we rely almost exclusively on the district court's decision to develop our factual background.

Brown, Huber, and Samson are all parties to a joint operating agreement executed in 1959. The joint operating agreement covers several properties, including the Cummings and Lance wells, and contains a preferential right to purchase provision which we spotlight as the center of the current controversy:

> Should any party desire to sell all or any part of its interests under this contract, or its rights and interests in the Unit Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties.

In 1997, Huber agreed to sell many of its oil and gas leasehold interests to Coda Energy, Inc. (Coda), including its interests in the Cummings and Lance wells. The Coda agreement accounts for the existence of preferential right-holders by allowing for the exclusion of a property, and a corresponding reduction in Coda's purchase price, when a party exercises its preferential right to purchase. In order to accomplish any necessary reduction, a schedule is attached at the end of the Coda agreement listing allocated values for the individual leasehold interests.

Pursuant to the preferential right to purchase provision, Huber notified Brown and Samson of its intent to sell its interests in the Cummings and Lance wells, and the terms of the sale. The letter to Samson listed the aggregate price Coda agreed to pay for both the Cummings and Lance wells. Brown elected to exercise its right in the Cummings well, and Samson elected to exercise its rights in the Cummings and Lance wells. Subsequently, in a letter to Samson and Brown confirming the elections, Huber listed separate values for the Cummings and Lance wells. Armed with this information, Samson withdrew its original election and notified Huber it wished to exercise its preferential right solely as to the Cummings well. Huber considered Samson's refusal to purchase its interests in both wells a violation of the preferential right to purchase provision, and eventually sold its remaining interest in the Cummings well to Brown.

The litigation drama unfolded. Brown sued Samson seeking a declaratory judgment confirming its ownership of Huber's interest in the Cummings well and requesting an immediate cash balancing of the Cummings well. Samson counterclaimed, joining Huber as a third-party defendant, pursuing its own declaratory judgment finding Huber's conveyance to Brown null and void and seeking ownership itself. The parties filed cross-motions for summary judgment. In its Order granting Samson's motion, the district court examined the preferential

right to purchase provision and focused on the language giving Samson "the right to purchase on the same terms and conditions <u>the interest which Huber proposes to sell</u>." (Emphasis in Order). The court then determined Huber proposed to sell two separate and distinct interests in the Cummings and Lance wells, activating two separate preferential rights to purchase, and Samson could exercise either right exclusive of the other.[2] This timely appeal followed.[3] We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court under Fed. R. Civ. P. 56(c)." *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted), *cert. denied*, 523 U.S. 1048 (1998). Summary judgment is appropriate when "there are no genuine issues of material fact and the moving party is due judgment as a matter of law." *Id*.

---

[2] Having found Samson could exercise its preferential right solely in the Cummings well, the district court went on to hold Samson attempted to exercise that right in a proper manner. Given this result, the court necessarily denied Brown's claim for immediate cash balancing.

[3] Brown and Huber filed separate notices of appeal. We subsequently granted the parties' joint motion to consolidate the appeals for procedural purposes. Because of the nature of the issues presented, we dispose of both appeals in this Order and Judgment.

Brown, Huber, and Samson all averred, through a joint application filed with the district court, no genuine issues of material fact exist in this case. Therefore, our focus on appeal turns to the proper application of the appropriate law. "A federal court sitting in diversity must apply the law of the forum state, in this case Oklahoma, and thus must ascertain and apply Oklahoma law with the objective that the result obtained in the federal court should be the result that would be reached in an Oklahoma court." *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 512 (10th Cir. 1994). On review, we give no deference to the district court's state-law determinations. *Id.* (citing *Salve Regina College v. Russell*, 499 U.S. 225 (1991)).

**ANALYSIS**

In its seminal case related to preferential right to purchase provisions, the Oklahoma Supreme Court stated the right "requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the [preferential right] on terms identical to those the owner has received from another...." *Ollie v. Rainbolt*, 669 P.2d 275, 279 (Okla. 1983) (referring to the right as a "right of first refusal," or a "right of preemption"). Such a provision allows the parties an opportunity to increase their ownership interest in the shared property at issue while also providing a mechanism to exclude undesirable potential co-owners from the property. *See* Gary B. Conine, *Property Provisions of the Operating*

-6-

*Agreement – Interpretation, Validity, and Enforceability*, 19 Tex. Tech L. Rev. 1263, 1317 (1988).

In *Ollie*, plaintiff stockholders had a preferential right to purchase a portion of a larger pool of stock defendants wished to sell to a third party. *Ollie*, 669 P.2d at 277. Specifically, three separate agreements extended a right of first refusal to plaintiffs in blocks of 7,200, 5,600, and 12,400 shares of stock. *Id*. at 278 & n.1. Defendants' agreement with the third-party buyer called for the sale of 52,800 shares. *Id*. at 277-78. Pursuant to the preference, defendants offered plaintiffs an opportunity to purchase the entire package of tendered stock, including the shares not covered by the plaintiffs' preference. *Id*. at 277. Plaintiffs elected to limit their purchase to the 12,800 shares covered by the first two agreements. *Id*. at 278. The Oklahoma Supreme Court enjoined the defendants "from transferring their ownership in the preemption-encumbered stock until they have received a bona fide offer that is unrelated to any other stock and have given the plaintiffs appropriate notice with opportunity to meet that offer in conformity to the right of first refusal." *Id*. at 281.

In light of the lack of the necessary bona fide offer related solely to the encumbered stock, the court did not reach the issue presented here, "whether a

refusal by the plaintiffs to buy all the stock (covered by the three right-of-first-refusal agreements) as a unit operates as a rejection of the preemption offer." *Id*. at 281 n.14. To this day, the Oklahoma court has yet to address the issue. While this case presents an opportunity to examine the public policy implications and propriety of the exercise of a preferential right in individual parts of a larger package deal, we prefer to stand in the wings and allow the Oklahoma Supreme Court to eventually make those determinations.[4] The parties argued this case, and the district court decided it, solely on contract interpretation principles. Therefore, our holding is so limited.[5]

---

[4] The Oklahoma Supreme Court apparently will be asked to decide the issue sooner rather than later. Brown originally filed the current suit in state court. Prior to removing this suit to federal court, Samson brought its own suit in state court raising what it claims is a nearly identical issue as the one presented here, albeit through an unrelated contract involving different parties. Samson prevailed in the state trial court, *Samson Resources Co. v. Amerada Hess Corp.*, No. CJ-96-38 (Okla. D. Ellis County Aug. 31, 1999), and the case awaits review and disposition in the state appellate court system. Whether the Oklahoma Supreme Court will hear the case remains to be seen.

Samson included the state trial court's decision, and its summary judgment materials submitted to the court, as attachments to its response brief on appeal. Brown and Huber then filed a motion to strike Samson's response because these documents were not presented to the district court. We limit our consideration on appeal to evidence before the district court, and deny the motion.

[5] We also note, as did the district court, the parties agree the sale of the Cummings and Lance wells as part of the larger "package deal" activated Samson's preferential right to purchase. This conclusion is by no means universally accepted by courts addressing the issue, nor is it necessarily the law in Oklahoma. *See* Bernard Daskal, Note, *Rights of First Refusal and the Package Deal*, 22 Fordham Urb. L.J. 461 (1995). However, given the status of this case, we assume Samson's preferential right was properly activated.

While "[c]ontract interpretation is governed by statute in Oklahoma," the principles are familiar. *Lucas v. Bishop*, 956 P.2d 871, 874 (Okla. 1998). For instance, when a contract is unambiguous, and does not involve an absurdity, the language governs its interpretation. Okla. Stat. tit 15, § 154. When examining the language, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others." *Id.*, § 157.

In its Order, the district court first examined the preferential right to purchase provision and highlighted the following sentence: "The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell." The court then endeavored to define the interest Huber proposed to sell. The court began the task by listing four reasons this case was not a typical exercise of a preferential right: (1) the non-uniformity of the identity and interests of the various owners of the wells under the joint operating agreement; (2) Huber's sale to Coda included wells not covered by the joint operating agreement; (3) therefore, Samson would not completely step into Coda's shoes because the deal included wells Samson had no right to purchase;

and (4) "the agreement between Huber and CODA provides for exclusion of any properties/wells in which a [preferential right to purchase] is exercised and for a corresponding reduction in purchase price; even if [the rights] are exercised, CODA will still be purchasing some properties from Huber." Finally, based on the unusual facts of this case and the language of the preferential right to purchase provision, the trial court reasoned Huber sold two separate interests to Coda, therefore two separate preferential rights were triggered, and "Samson could exercise either [right], both [rights], or neither [right]."

In addition to supporting the district court's interpretation of the contract, Samson emphasizes the first sentence of the preferential right to purchase provision, which activates the preferential right when "any party desire[s] to sell all or any part of its interests under this contract." Samson muses the "or any part" language guarantees the holder of a preferential right the ability to exercise its right as to any part of the interest being sold, so long as it is done on the same terms and conditions as proposed in the sale. We find fault with this interpretation and reverse the district court's determination.

Samson's interpretation ignores the most basic rules of grammar and sentence structure. The "or any part" language Samson emphasizes clearly

applies to the interest Huber is selling, not Samson's preferential right. Substituting the parties' names into the provision, the contract reads: "Should [Huber] desire to sell all or any part of its interests under this contract, ... [Samson] shall then have an optional prior right ... to purchase on the same terms and conditions the interest which [Huber] proposes to sell." The provision gives Huber unfettered discretion to sell "any part of its interest," then in the next sentence strictly limits Samson's preferential purchase right to the very interest "[Huber] proposes to sell." Samson's argument that this language allows it any flexibility in exercising its preferential right, beyond a simple acceptance or rejection of Huber's sale offer, is indefensible.

Having determined the clear language of the preferential right to purchase provision restricts Samson's right to the interest Huber proposed for sale, the only remaining question is the one answered by the district court: what was the interest Huber proposed to sell? The district court and Samson point to the Coda agreement's inclusion of allocated values for individual wells, and the corresponding reduction in Coda's purchase price if a party exercised its preference right in a well, as support for the finding Huber proposed to sell each

well separately.[6]  This reasoning ignores the reality of the Coda agreement. Huber sold its interests in hundreds of wells to Coda in a single transaction.  The agreement described the property to be sold as "[a]ll right, title and interest of Seller in and to the oil, gas and/or mineral leases and other properties described on Exhibit "A" ...."  Exhibit A consists of ninety-three pages listing all the properties included in the sale.  The purchase price is listed as a single "Base

---

[6]  Specifically, the Coda agreement contains the following language:

Seller has used reasonable efforts within the confines of its own records, and consistent with industry practices in transactions of this type, to identify, with respect to all Oil and Gas Properties, (i) all preferential rights to purchase ("Preferential Rights") which would be applicable to the transactions contemplated hereby; and (ii) the names and addresses of parties holding such rights.  Seller shall, promptly after execution of this Agreement request, from the parties so identified (and <u>in accordance with the documents creating such rights</u>), execution of waivers of the Preferential Rights so identified....  If a party from whom a waiver of a Preferential Right is requested refuses to give such waiver, <u>Seller agrees that it will tender to such party the required interest in the Property (with the interest tendered by Seller being tendered at a price equal to the amount specified in Schedules 1 or 1-A hereto for such Property</u>, reduced appropriately, as determined by mutual agreement of Buyer and Seller, if less than the entire Property is tendered), and to the extent that such Preferential Right is exercised by such party, and such interest in such Property is actually sold at such price to such party so exercising such right (and such party makes payment therefor to Seller), <u>such interest in such Property will be excluded</u> from the transaction contemplated hereby and the <u>Purchase Price will be adjusted downward by the amount paid to Seller by the party exercising such right</u>.

(Emphasis added by Samson in its brief on appeal).

-12-

Purchase Price", which as noted can be adjusted when third parties exercise their preferential right to purchase. This was a large package deal, not a plethora of separate sales of distinct interests.

The fact the Coda agreement accounted for each well independently was a recognition that some of the properties were subject to a preferential right to purchase, while others were not. The individual accounting gave Coda and Huber a quick way to adjust the Base Purchase Price once individual right-holders exercised their rights under the respective joint operating agreements. In addition, the allocation could not occur on a unit basis because some right-holders – Brown included – held preferential rights in a single well which was part of a larger unit covered by one joint operating agreement. These provisions do not change the fundamental character of the sale. Huber wanted to sell both the Cummings and Lance wells, and it found a willing buyer. We hold the interest Huber sold was its combined interests in all the properties listed in attachment A of the Coda agreement.[7] As to Samson, we see no reason why it should matter if the two properties in which it has a preferential right are sold as part of a larger

---

[7] Because we disagree with the district court on the issue of whether Samson could exercise its preferential right in only one of the two wells at issue here, we do not reach the court's finding that Samson's ultimate exercise of its right was proper.

group.  Huber entered into a proposed sale of both properties together, for a listed price.  In order to offer Huber the identical terms, Samson was required to match the offer.

In conclusion, the Coda agreement required Huber to comply with any relevant joint operating agreement granting preferential rights of purchase to third parties.  Huber did so by notifying Samson of the proposed sale to Coda, and including a list of the properties Huber was selling in which Samson held a preferential right to purchase pursuant to the single joint operating agreement.  The proposed sale included both the Cummings and Lance wells.[8]  Huber

---

[8]  We were informed by counsel after oral argument that Coda ultimately did not buy the Lance well.  Both parties subsequently submitted written arguments, pontificating that the information helped their case.  Samson went so far as to term the information "potentially dispositive," and stated it undercut Huber's most basic argument – that under the Coda agreement, Coda was not allowed to "cherry-pick" by buying one well and not the other, and therefore Samson could not exercise its rights in Cummings without also exercising its rights in Lance.  We decline to address either parties' reasoning because the argument was not made before the district court.

If Samson thought Coda's actual performance under the Coda agreement was material to its case, Samson should have pursued this issue through discovery, produced evidence of the parties' eventual performance under the agreement, and presented its arguments to the district court on the potential relevance, if any, Coda's actual purchase had on the terms of the original offer.  Instead, both parties agreed no material facts were left for trial.  Accordingly, we confine our review to the preferential right to purchase issue as identified and presented to the district court on cross motions for summary judgment.

-14-

correctly offered "the property first to the person entitled to the [preferential right] on terms identical to those [it] received from [Coda]...." *Ollie*, 669 P.2d at 279.  Having received Huber's offer, Samson was entitled to either accept or reject the offer in its entirety.

This interpretation is based on the clear and unambiguous language of the two contracts at issue, and simultaneously protects Huber's right to make its bargain and Samson's rights to increase its ownership and control potential co-owners in the properties subject to the joint operating agreement.  We know from *Ollie* Samson cannot be forced to choose between purchasing all the interests, whether subject to their preferential right or not, included in the Coda agreement, and forfeiting its preferential right to purchase in the Cummings and Lance wells. *See Ollie*, 669 P.2d at 279.  However, Samson cannot unilaterally reduce its obligation, under the preferential right to purchase provision, to exercise its rights in the Cummings and Lance wells by purchasing the full interest Huber proposed to sell.

Having thoroughly reviewed the contract provisions and the arguments on appeal, we hold Samson's attempt to exercise its preferential right to purchase Huber's interest in the Cummings well and not the Lance well, when both wells

were subject to the same joint operating agreement and were included in the same proposed sale, was a rejection of Huber's offer. In light of the rejection, Huber lawfully sold the remaining interest in Cummings to Brown. Accordingly, we **REVERSE** the district court and remand with instructions to enter an order consistent with this opinion. Because it has yet to reach the issue, we leave for the district court the propriety of Brown's cause of action for immediate cash balancing.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge